# EXHIBIT A

1

2

3

4

5

6

7     **SUPERIOR COURT OF THE STATE OF WASHINGTON**

8     **FOR THE COUNTY OF KING**

9

10    RICHARD ORTOLI, as Administrator          **CASE NO.**
      CTA of the Estate of Paul-Henri Louis

11    Emile Nargeolet, Deceased
                        Plaintiff,              **COMPLAINT UNDER THE JONES**

12                                              **ACT, 46 U.S.C. § 30104 et seq., THE**
                                                **GENERAL MARITIME LAW, AND**

13    vs.                                       **WASHINGTON STATE LAW;**
                                                **DEMAND FOR JURY TRIAL**

14    OCEANGATE INC., THE ESTATE
      OF R.S. RUSH III, TONY NISSEN,

15    ELECTROIMPACT INC., JANICKI
      INDUSTRIES, INC., and

16    HYDROSPACE GROUP, INC.
                        Defendants.

17

18              **PLAINTIFF'S ORIGINAL COMPLAINT**

19              COMES NOW PLAINTIFF RICHARD ORTOLI ("Plaintiff"), as Administrator CTA of

20    the Estate of Paul-Henri Louis Emile Nargeolet, Deceased ("Decedent Nargeolet") and brings this

21    action against Defendants OCEANGATE INC., THE ESTATE OF R.S. RUSH III, TONY

22    NISSEN, ELECTROIMPACT INC., JANICKI INDUSTRIES, INC., and HYDROSPACE

23    GROUP, INC. (collectively, "Defendants") for their wrongdoing detailed below.

24              I.      **INTRODUCTION**

25    **1.1**    On June 18, 2023, in the waters of the North Atlantic off the coast of Newfoundland, Paul-

26    Henri Nargeolet and five other crew members boarded the manned deep-sea submersible TITAN

**COMPLAINT** - 1                              SCHECTER, SHAFFER & HARRIS, LLP
                                                3200 TRAVIS, 3RD FLOOR
                                                HOUSTON, TX 77006
                                                (713) 524-3500

and began a descent towards the most famous shipwreck in history – the *Titanic*.  Mere hours later, the world learned that TITAN'S surface support ship had lost contact with the submersible, and waited with bated breath for further news of the crew's plight.  Ultimately, everyone's worst fears were confirmed: the TITAN had suffered a catastrophic implosion under the tremendous weight of the ocean's depths.  All five crewmembers, including Nargeolet, died.

1.2     Decedent Nargeolet was known worldwide as "Mr. Titanic."  A charismatic and beloved adventurer and a legend in the diving community, Nargeolet had participated in thirty-seven dives to the wreckage of the *Titanic* – the most of any diver worldwide – over the course of his storied career.  He was part of the first expedition to visit *Titanic* in 1987 shortly after its location was discovered and had supervised the salvage of innumerable *Titanic* artifacts.  Nargeolet was the director of underwater research at RMS Titanic, which owns the salvage rights to the sunken ship.  In the diving community, Paul-Henri Nargeolet (or "PH" as he was often known) was synonymous with the *Titanic*.

1.3     Decedent Nargeolet was also an employee of Defendant OCEANGATE INC., a deep-sea diving and submersible company that designed and built TITAN for the purpose of repeatedly voyaging to the *Titanic*.  Decedent Nargeolet served as a crewmember aboard the TITAN; his job was to guide other crewmembers and assist with navigation through the *Titanic* wreckage, which he knew so well.

1.4     OCEANGATE was founded by Richard Stockton RUSH, an eccentric and self-styled "innovator" in the deep-sea diving industry.  As detailed herein, OCEANGATE, RUSH and the remaining Defendants designed, constructed and operated TITAN, in almost every way, in a manner outside the norms of the diving community and industry, driven by RUSH's apparent obsession with being remembered for "innovation" alongside such luminaries as Steve Jobs and Elon Musk.

1.5     Decedent Nargeolet may have died doing what he loved to do, but his death – and the deaths of the other TITAN crew members – was wrongful.  The catastrophic implosion that

SCHECTER, SHAFFER & HARRIS, LLP
3200 TRAVIS, 3RD FLOOR
HOUSTON, TX 77006
(713) 524-3500

claimed Nargeolet's life was due directly to the persistent carelessness, recklessness and negligence of OCEANGATE, RUSH and other Defendants in their design, construction and operation of TITAN.  Moreover, OCEANGATE, RUSH and the other Defendants were warned, repeatedly, by multiple deep-sea diving experts and engineers, about the potentially fatal consequences of their choices and actions.  Defendants did not heed those warnings, but rather appear to have been increasingly motivated over time to ignore them. Worse, in many instances, RUSH concealed dangers of which he was aware, specifically providing only certain information to his crew and the public at large. The warnings proved prescient.  Decedent Nargeolet's death was a tragic but eminently preventable occurrence.

## II.    <u>JURISDICTION</u>

**2.1**     This is an action within the maritime jurisdiction of this Court.  This claim is maintained under the Jones Act, 46 U.S.C. § 30104 et seq., and the General Maritime Law of the United States, and any other applicable laws that Plaintiff will plead and prove.  Plaintiff hereby exercises the right to pursue the claims asserted herein in state court, pursuant to the Savings to Suitors clause, 28 U.S.C. § 1333.

**2.2**     In the alternative, Plaintiff brings these claims against Defendants under Washington state law for negligence, wrongful death, and products liability.

## III.    <u>PARTIES</u>

**3.1**     Plaintiff RICHARD ORTOLI is domiciled in Miami, Florida, and has been duly appointed as the Administrator CTA of the Estate of Paul-Henri Louis Emile Nargeolet by the Dutchess County Surrogate's Court in the State of New York.  Plaintiff RICHARD ORTOLI maintains this suit for the benefit of beneficiaries allowed to recover on a cause of action stemming from the death of Decedent Nargeolet.

**3.2**     Defendant OCEANGATE INC. is a domestic corporation doing business in the State of Washington, King County.  This Defendant may be served with due process by serving its registered agent, Fairchild Record Search LTD., 3400 Capitol Blvd SE STE 101, Tumwater,

Washington 98501-3351.

**3.3**     Defendant the ESTATE OF R.S. RUSH III refers to the Estate of Decedent, R.S. RUSH III (also known as Richard Stockton Rush III).  The Decedent R.S. RUSH III ("RUSH") died a resident of King County, Washington, on June 18, 2023, and the probate proceeding stemming from his death is pending in the Superior Court of Washington for King County.  This Defendant may be served with due process by serving the Personal Representative of the Estate of R.S. RUSH III, which is the Decedent's surviving spouse, Wendy Weil Rush, through her counsel of record in the probate proceeding, Lora L. Brown of the Law Offices of Lora L. Brown, 1420 Fifth Avenue, Suite 3000, Seattle, Washington 98101.

**3.4**     Defendant TONY NISSEN is a natural person of majority age and is the former Director of Engineering of OCEANGATE INC.  This Defendant may be served with due process at his residence or wherever he may be found.

**3.5**     Defendant ELECTROIMPACT INC. is a domestic corporation doing business in the State of Washington with its principal office in Mukilteo, Washington.  This Defendant may be served with due process by serving its registered agent, Peter Zieve, 4413 Chennault Beach Rd., Mukilteo, Washington, 98275-5048.

**3.6**     Defendant JANICKI INDUSTRIES, INC. is a domestic corporation doing business in the State of Washington with its principal office in Sedro-Woolley, Washington.  This Defendant may be served with due process by serving its registered agent, Peter W Janicki, 719 Metcalf St., Sedro-Woolley, Washington, 98284-1420.

**3.7**     Defendant HYDROSPACE GROUP INC. is a foreign corporation doing business in the State of Washington with its principal office in Claremont, California.  This Defendant may be served with due process by serving its registered agent, William Kohnen, 717 West 12th Street, Claremont, California, 91711.

### IV.     <u>VENUE</u>

**4.1**     Venue is proper in King County, Washington under Wash. Rev. Code Ann. § 4.12.025

because one or more Defendants resides in King County, Washington and/or performs substantial business in King County, Washington.

## V.    FACTS AND GENERAL ALLEGATIONS

**5.1**    Plaintiff RICHARD ORTOLI has been duly appointed as the Administrator CTA of the Estate of Paul-Henri Louis Emile Nargeolet by the Dutchess County Surrogate's Court in the State of New York.  Plaintiff brings this lawsuit as a result of the death of Paul-Henri Louis Emile Nargeolet aboard TITAN on or about June 18, 2023.

**5.2**    At the time of his death, Decedent Nargeolet was a resident of Dutchess County, New York.

**5.3**    Decedent Nargeolet was survived by his spouse, Anne Sarraz-Bournet, and his children, Julien Nargeolet, Sidonie Nargeolet, and Chloe Nargeolet.

**5.4**    Prior to his death, Decedent Nargeolet contributed both financial and non-economic support to his spouse and children.

**5.5**    Plaintiff maintains this suit for the benefit of beneficiaries allowed to recover on a cause of action stemming from the death of Decedent Nargeolet.

**5.6**    On or about June 18, 2023, employees and/or agents of one or more named Defendants, negligently and recklessly caused the death of Paul-Henri Louis Emile Nargeolet onboard the TITAN, a submersible vessel operating in navigable waters.

### RUSH, OCEANGATE, and the Development of TITAN

**5.7**    Decedent RUSH was the co-founder and acting Chief Executive Officer of Defendant OCEANGATE INC. until his death on or about June 18, 2023.

**5.8**    OCEANGATE was formed by RUSH for the purpose of designing, constructing and operating manned deep-sea submersibles, including TITAN, primarily for the purpose of diving to and exploring the wreckage of the *Titanic*.

**5.9**    RUSH actively cultivated an image as a "maverick genius" of the deep-sea diving world. On several occasions, RUSH described himself as an industry "disrupter" and compared himself

1   to Steve Jobs or Elon Musk.

2   **5.10**    RUSH seemed to proudly flaunt convention and the "rules" of the industry, claiming that

3   many industry rules regarding submersible design "didn't make engineering sense" to him.

4   Indeed, in an interview prior to the TITAN's implosion, RUSH even went so far as to say to

5   journalist David Pogue that "At some point, safety just is pure waste."  To RUSH, "the more stuff

6   you've broken, the more innovative you've been."

7   **5.11**    RUSH's devil-may-care approach to safety and obsessive quest for "innovation" above

8   all else appears to have permeated the design process behind TITAN.

9                 **RUSH's and OCEANGATE's "Innovative" but Dangerous Design**

10                                *TITAN's Carbon-Fiber Hull*

11   **5.12**    Other than TITAN, no commercial manned submersible has ever suffered an implosion

12   (only early military submarines have done so).

13   **5.13**    Other than TITAN, modern commercial manned submersibles for deep-sea exploration

14   are generally made from titanium.  Titanium is an exceptionally strong metal that strengthens

15   under repeated exposure to high stress.  That is, with each dive, a titanium submersible can

16   actually increase in hull strength.

17   **5.14**    RUSH believed that titanium was unnecessarily heavy.  TITAN's hull, at RUSH's

18   direction, was made from carbon fiber, which RUSH called "a great material" and "better than

19   titanium."  In contrast to titanium, carbon fiber breaks down over time under pressure.

20   **5.15**    RUSH acknowledged the possibility for "catastrophic failure where you have

21   imperfections in the [carbon fiber] structure."  Noting that carbon fiber makes a "crackling" noise

22   under excessive stress, RUSH proposed and installed on TITAN an "acoustic safety system" to

23   detect such crackling.  According to RUSH's thinking, the crackling noise would then warn the

24   submersible's pilot to begin an ascent.  In fact, RUSH portrayed this "safety system" – which is

25   nothing more than the detection of a possibly imminent failure of the carbon fiber hull, in a

26   manner in which carbon fiber is known to fail under pressure – as an advanced feature unique to

**COMPLAINT** - 6

the TITAN in OCEANGATE'S promotional materials.

**5.16**   TITAN was and remains the only submersible ever produced with a carbon-fiber hull.

**5.17**   In addition to being constructed of carbon fiber, TITAN's hull was cylindrical with hemispherical ends.  This also differed from traditional submersible design and construction.  Deep-sea submersibles prior to TITAN have been spherical in shape, as spheres are known to be capable of withstanding the extreme pressure of deep-sea environments.

*TITAN's Electronics Systems*

**5.18**   TITAN was piloted using a mass-produced Logitech video game controller (normally used with a PlayStation or Xbox) rather than a controller custom-made for TITAN's design and operation.  Moreover, the controller was Bluetooth, rather than hardwired.  TITAN also had only "one button" (for power) within its main chamber – the remainder of its controls (for lights, ballast and so on) and gauges (for depth, oxygen level and so forth) were touchscreen.  RUSH stated that TITAN was "to other submersibles what the iPhone was to the BlackBerry."  As with an iPhone, however, none of the controller, controls or gauges would work without a constant source of power and a wireless signal.

**5.19**   TITAN's hip, contemporary, wireless electronics systems, which differed entirely from any previously designed submersible, were conceived and constructed by an electrical engineering team at OCEANGATE composed largely of either current students or recent graduates of nearby Washington State University.  These were engineers with virtually no real-world experience and no prior exposure to the deep-sea diving industry.

**5.20**   Defendant TONY NISSEN, OCEANGATE's Director of Engineering, offered to hire at least several of these engineers (as interns, while they were still students) when the students offered potential solutions to "challenges" faced by OCEANGATE and described by NISSEN during a tour of OCEANGATE's facility.  The first such student hired had, by 2023, become the lead electrical engineer at OCEANGATE at the time of the TITAN implosion, despite only being a 2017 graduate and having six or fewer years' of relevant work experience.

SCHECTER, SHAFFER & HARRIS, LLP
3200 TRAVIS, 3RD FLOOR
HOUSTON, TX 77006
(713) 524-3500

1

*TITAN's Plexiglass Viewport*

2 **5.21**    Part of TITAN's design, like other submersibles, included a viewport through which the

3 underwater environment could be viewed directly by occupants.  Because viewports must be

4 constructed from a different (and transparent) material, they present design and engineering

5 challenges that differ from a vessel's hull.

6 **5.22**    The *Titanic* rests on the ocean floor at a depth of approximately 3800 meters.  The

7 atmospheric pressure at that depth is an immense 6000 pounds per square inch.  Every single

8 aspect of TITAN's exterior had to be engineered and built to withstand *at least* that amount of

9 constant pressure while diving.

10 **5.23**    The exact specifications of TITAN's porthole as of June 18, 2023 are not presently known

11 to Plaintiff.  However, based on documents from 2018, the plexiglass viewport on TITAN at that

12 time was rated only for approximately 1300 meters – one-third of the depth at which the *Titanic*

13 lay.

14 **5.24**    Those same documents indicated that OCEANGATE was unwilling to spend the money

15 required to design and construct a plexiglass viewport which would be sufficient, based on

16 accepted standards, to withstand the amount of pressure at the depths of the *Titanic*.

17

*TITAN'S Use of Disparate Materials*

18 **5.25**    TITAN had a carbon-fiber hull but also employed titanium parts connected to that hull.

19 Its viewport, as alleged above, also connected to its hull and was made from plexiglass.  These

20 different materials, at various points on the TITAN, were necessarily joined together and sealed.

21 Those seals were critical to TITAN's integrity and safety.  Above all else, it was necessary for

22 TITAN to remain pressurized, airtight, and watertight.

23 **5.26**    However, at least one expert has pointed out that these three materials are very dissimilar

24 and have "different coefficients of expansion and compression."  When joined or sealed together,

25 the materials' different coefficients of expansion and compression can lead to loosening or

26 separation when subjected to numerous repeated cycles in depth, as would have been the case

**COMPLAINT** - 8

1  after TITAN's previous dives over its lifetime.

2  **Rush and Oceangate Ignored the Safety Concerns of Employees and Others**

3  **5.27**  In 2015, David Lochridge was hired by OCEANGATE as its head of marine operations

4  and chief submersible pilot.  In this position, Lochridge was ultimately responsible for "ensuring

5  the safety of all crew and clients."

6  **5.28**  In 2017, as TITAN was in development and being prepared for testing, Lochridge voiced

7  concerns about TITAN's design.  His concerns were dismissed, including by RUSH and NISSEN,

8  allegedly because Lochridge was not an engineer. In early 2018, following an inspection of

9  TITAN prior to trials in the Bahamas, Lochridge wrote a detailed report containing his

10  observations and safety concerns, including concerns regarding the integrity of TITAN's carbon-

11  fiber hull (for which he requested a complete scan).

12  **5.29**  Infuriated at Lochridge's report, RUSH refused to perform a scan of the hull and insisted

13  that his "acoustic safety system" was sufficient to detect a lack of structural integrity in the hull.

14  At the conclusion of a two-hour meeting addressing Lochridge's safety report, RUSH terminated

15  Lochridge – the OCEANGATE employee ultimately most responsible for the safety of anyone

16  sailing on TITAN.

17  **5.30**  Shortly after his termination from OCEANGATE, Lochridge told Rob McCallum, another

18  deep-sea explorer as well as a close friend and longtime colleague of Decedent Nargeolet, that

19  there was "no way on earth you could have paid me to dive that thing [*i.e.,* TITAN]."  Lochridge

20  stated that he was "worried [RUSH] kills himself and others in the quest to boost his ego" and

21  concluded to McCallum that TITAN was a "lemon" – that is, unsalvageable in its design as a

22  deep-sea craft.

23  **5.31**  McCallum, like Lochridge, also tried to warn RUSH about TITAN's safety issues and

24  seaworthiness at depth.  McCallum reportedly told RUSH that "you can't cut corners in the deep"

25  and that the issues with TITAN's "experimental" design were "not about being a disruptor.  It's

26  about the laws of physics."

COMPLAINT - 9

**5.32**    McCallum had also seen the *Cyclops I*, TITAN's predecessor, at OCEANGATE's workshop.   *Cyclops I* also had been controlled with a video game controller and had utilized wireless communications technology.   McCallum had observed and noted that the systems were subject to "multiple points of failure" and that "every sub in the world has hardwired controls for a reason," namely that a loss of signal would not imperil the vessel.   These observations were disregarded by OCEANGATE, as TITAN employed nearly identical systems to *Cyclops I*.

**5.33**    McCallum appeared to understand what RUSH refused to believe – that based on the unavoidable laws of physics, the materials and design of TITAN could not hold up over time to the challenges of deep-sea expeditions.   Moreover, McCallum's warnings reflected a respect of time-tested knowledge within the deep-sea diving community that RUSH and OCEANGATE appeared too easily to dismiss.   A catastrophic disaster might not occur on TITAN's first, second, or even fifth dive, but a disaster *would* occur.   It was a matter of when, not if.

**5.34**    Lochridge and McCallum were far from alone in voicing warnings to RUSH and OCEANGATE over the course of TITAN's development.   In 2018, for instance, the Marine Technology Society sent a letter to OCEANGATE stating that "the current 'experimental' approach adopted by OceanGate … could result in negative outcomes (from minor to catastrophic)."   The BBC has noted that numerous experts "had raised many serious questions about the safety of the Titan submersible prior to" the TITAN's fateful final dive.   None of the warnings were heeded.

### RUSH and OCEANGATE Declined to Have TITAN Certified

**5.35**    Deep-sea submersibles may be and often are "classed" and certified by the marine-classification society DNV.   Classification and certification involve the use of a DNV engineer at "every stage of the submersible's creation, from design to sea trials to diving."   DNV certification is rigorous and reflects a submersible's compliance with the most current and accepted standards of deep-sea diving practice and technology.

**5.36**    For instance, the *Limiting Factor* is a submersible designed and built by Triton

Submarines which had, in the years prior to the TITAN's final voyage, dived to the deepest points in each of the world's oceans, including the immensely deep Mariana Trench. Decedent Nargeolet had, with his friend Rob McCallum, participated in the *Limiting Factor's* voyages. The *Limiting Factor* had been designed in collaboration with DNV and had been certified and granted a depth rating of "unlimited."

**5.37**    RUSH and OCEANGATE, by contrast, declined to seek DNV certification for TITAN. RUSH believed that it would be too difficult to "educate" DNV personnel – who are by any measure world-class experts on the requirements and dangers of deep-sea diving – on the purported advantages of TITAN's "innovative" design. RUSH appears to have believed that DNV, like nearly everyone else in the industry except for himself, were stuck in and held captive to the past.

**5.38**    As a result of RUSH's and OCEANGATE's failure to seek classification and certification for TITAN, there were no independent or third-party sources for information or assurances regarding TITAN's safety and seaworthiness – only RUSH and other OCEANGATE personnel themselves.

**RUSH and OCEANGATE Hired Nargeolet But Failed to Disclose Material Information**

**5.39**    As alleged above, Decedent Nargeolet was a legend within the deep-sea diving community, known as "Mr. Titanic." By almost all accounts, Nargeolet was obsessed with the *Titanic*, taking advantage of every opportunity presented to him to visit it. Altogether, Nargeolet dove to the *Titanic* thirty-seven times over his lifetime.

**5.40**    Decedent Nargeolet's deep knowledge and prior experience of the *Titanic* shipwreck site meant that he, perhaps more than any other human being, best knew the position and layout of the *Titanic* on the ocean floor. Nargeolet was uniquely qualified to guide a submersible (and its pilot) around the many potential dangers presented by the shipwreck, and to explain to persons on the submersible what any viewable portions of the *Titanic's* wreckage were.

**5.41**    These reasons are precisely why OCEANGATE hired Decedent Nargeolet as a crew

SCHECTER, SHAFFER & HARRIS, LLP
3200 TRAVIS, 3RD FLOOR
HOUSTON, TX 77006
(713) 524-3500

member aboard TITAN.  Nargeolet's role was to act as navigator near the *Titanic* based on his detailed knowledge of the site; to act as a guide, explaining to other crew members what they were seeing; and to collect scientific data, identify degradation and wreckage changes, and similar tasks.  Nargeolet, a former commander in the French navy with a lifetime of deep-sea experience, was also well-qualified to act in almost any other capacity required on a submersible voyage.  As a lifelong diver obsessed with the *Titanic*, it is easy to see why Nargeolet would want to take the job.

**5.42**    Decedent Nargeolet knew that the TITAN was different from other submersibles in that it was constructed from carbon fiber and used other unusual materials and components. However, Nargeolet was not an engineer, a submersible designer, or a physicist.

**5.43**    Nargeolet appears to have been persuaded that TITAN's carbon-fiber hull construction was safe *by implication* – Nargeolet had been told by RUSH that he "was working with Boeing, with a big company.  And when you see the way they were doing the cylinder – it's not in a garage, you know, with glue and stuff like that."

**5.44**    The imprimatur of Boeing as a co-developer and/or co-manufacturer alongside OCEANGATE, along with RUSH's related insinuations that the University of Washington was also involved with the company's submersible design and construction, gave Nargeolet the apparent assurance that serious minds and deep pockets were participating alongside RUSH and his team.

**5.45**    The problem is that the assertions by RUSH were simply not true.  Both Boeing and the University of Washington, while being forced to acknowledge some degree of limited participation or consulting with OCEANGATE and RUSH on *Cyclops I*, now deny that they were involved with the development of TITAN.

**5.46**    Furthermore, for all of RUSH's projected confidence in carbon fiber as an appropriate and superior material for submersible construction, RUSH confessed to a "mission specialist" on one *Titanic* voyage that he had "gotten the carbon fiber used to make the TITAN at a big discount

SCHECTER, SHAFFER & HARRIS, LLP
3200 TRAVIS, 3RD FLOOR
HOUSTON, TX 77006
(713) 524-3500

from Boeing because if was past its shelf-life for use in airplanes."

**5.47**    Nargeolet took RUSH's assurances of TITAN's seaworthiness and construction at face value, believing that other reputable and trustworthy companies or institutions had given TITAN their stamps of approval.

**5.48**    RUSH, knowingly, had implied that Boeing and the University of Washington were involved with the project in order to preempt or assuage any concerns Nargeolet might have had about TITAN's experimental construction.   RUSH furthermore made additional assurances to Nargeolet about the capabilities and safety features of TITAN and its construction materials that RUSH knew, or should have known, were not true and/or were not supported by the level of scientific evidence he claimed.

**5.49**    In short, neither RUSH nor OCEANGATE ever fully or accurately disclosed all of the material facts regarding TITAN's design and construction to Decedent Nargeolet.   On the contrary, RUSH and OCEANGATE actively fostered Nargeolet's (and others') false impressions about the safety and seaworthiness of the vessel.

**The June 18, 2023 Implosion**

**5.50**    The unclassified and experimental TITAN dove to the depth of the Titanic only a limited number of times prior to June 18, 2023.  As explained above, each of those prior dives could have or would have weakened TITAN's carbon-fiber hull and/or the connections and seals between disparate types of material.

**5.51**    On June 18, 2023, Decedent Nargeolet and RUSH joined Pakistani businessman Shahzada Dawood, Dawood's son Sulaiman, and British billionaire Hamish Harding aboard the TITAN to descend to the *Titanic*.

**5.52**    To secure their places aboard TITAN, the Dawoods and Harding presumably would have donated $250,000 each to OCEANGATE's exploration efforts and been trained in the vessel's operation as additional crew members prior to the voyage.

**5.53**    OCEANGATE required all crew members (or "mission specialists" as he called them) to

SCHECTER, SHAFFER & HARRIS, LLP
3200 TRAVIS, 3RD FLOOR
HOUSTON, TX 77006
(713) 524-3500

sign a waiver and release prior to any dive.  The waiver and release read as follows:

> This operation will be conducted inside an experimental submersible vessel that has not been approved or certified by any regulatory body, and may be constructed of materials that have not been widely used in human-occupied submersibles.

> Travel in and around the vessel could result in physical injury, disability, emotional trauma, or death.

> The support vessel could expose me to property damage, injury, disability, or death.

> Assisting in the operation of the sub could lead to property injury, disability, or death.

This waiver and release failed to disclose many key, relevant risk factors, detailed above, regarding the design and operation of TITAN or the materials used in its construction. Further, OCEANGATE's waiver is insufficient and ineffective to relieve OCEANGATE of liability for its own gross negligence and/or RUSH's misrepresentations to Nargeolet.

**5.54**   Approximately ninety minutes into the TITAN's dive on June 18, 2023, it became clear that something was wrong.  At a depth of approximately 3500 meters (just above the *Titanic*), the TITAN "dropped weights" – indicating that the team had aborted, or attempted to abort, the dive. Shortly thereafter, the TITAN lost communications with its surface support ship.  After that, the TITAN's tracking system also failed.  The TITAN and its crew were gone.

**5.55**   The United States Navy later confirmed what had been widely suspected.  Approximately ninety minutes into the TITAN's dive, naval acoustic devices observed an acoustic signal consistent with a catastrophic implosion in the vicinity of the TITAN.

**5.56**   The United States Coast Guard is pursuing an ongoing investigation into the TITAN explosion.  It may never be known for certain exactly which of the "multiple points of failure" identified by Rob McCallum and others was responsible for the implosion, or whether the implosion resulted from a daisy chain of failures of multiple improperly designed or constructed

SCHECTER, SHAFFER & HARRIS, LLP
3200 TRAVIS, 3RD FLOOR
HOUSTON, TX 77006
(713) 524-3500

parts or systems.

**5.57**　While the exact cause of failure may never be determined, experts agree that the TITAN's crew would have realized exactly what was happening.  RUSH's vaunted "acoustic safety system" would have alerted the crew that the carbon-fiber hull was cracking under extreme pressure – prompting the pilot to release weight and attempt to abort. Common sense dictates that the crew were well aware they were going to die, before dying.

**5.58**　But it is obvious that RUSH's safety mechanism – to drop weight in response to hull crackling – did not work.  The crew may well have heard the carbon fiber's crackling noise grow more intense as the weight of the water pressed on TITAN's hull.  The crew lost communications and perhaps power as well.  By experts' reckoning, they would have continued to descend, in full knowledge of the vessel's irreversible failures, experiencing terror and mental anguish prior to the TITAN ultimately imploding.

**5.59**　At all relevant times, the vessel TITAN was owned, operated, managed, and/or controlled by one or more Defendants.

**5.60**　At all relevant times the vessel TITAN was operating in navigable waters of the North Atlantic, near the location of the *Titanic* wreckage.

**5.61**　The implosion of the TITAN violently resulted in the death of all members onboard, including Decedent Nargeolet.

**5.62**　Defendants OCEANGATE INC., TONY NISSEN, ELECTROIMPACT INC., HYDROSPACE GROUP INC., JANICKI INDUSTRIES, INC., participated in the design, engineering, and manufacturing of the TITAN submersible vessel.

**5.63**　Defendant ELECTROIMPACT INC. laid the carbon fibers for the TITAN's second hull.

**5.64**　After the carbon fibers were laid out, Defendant JANICKI INDUSTRIES, INC. cured the material in its ovens.

**5.65**　Defendant HYDROSPACE GROUP INC. manufactured the acrylic viewport onboard the TITAN.

**COMPLAINT** - 15

**5.66**    Defendants OCEANGATE INC. and TONY NISSEN participated in and/or supervised the design of the TITAN vessel and its predecessor, *Cyclops I.*

**5.67**    Defendant TONY NISSEN was an employee of Defendant OCEANGATE during the development and manufacturing of TITAN. His role as Director of Engineering at Defendant OCEANGATE included but was not limited to managing various engineering priorities and providing support and technical oversight in the implementation and operation of the submersible vessel TITAN.   TONY NISSEN's scope of employment at Defendant OCEANGATE also included supporting the TITAN's machinery, launch/retrieval equipment, systems designs, documentation, planning, troubleshooting, certification, oversight of project management, and designing the viewport used in the final iteration TITAN.

## VI.    FIRST CAUSE OF ACTION FOR WRONGFUL DEATH, NEGLIGENCE, AND GROSS NEGLIGENCE  UNDER GENERAL ADMIRALTY LAW

**6.1**    Plaintiff re-avers and re-alleges each and every allegation of fact and law contained herein as if re-pled in their entirety.

**6.2**    Plaintiff brings this cause of action against Defendants, jointly and severally, pursuant to General Admiralty Law and the laws of the State of Washington.

**6.3**    At all times pertinent herein, one or more Defendants owned, operated, controlled and/or manned the TITAN submersible vessel.

**6.4**    On June 18, 2023, the TITAN imploded in navigable waters of the North Atlantic Ocean, off the coast of Newfoundland, Canada and beyond three nautical miles from the shore of the United States.

**6.5**    As a result of the implosion, Paul-Henri Louis Emile Nargeolet died onboard the TITAN.

**6.6**    The implosion of the TITAN, and the resulting death of Decedent Nargeolet, was caused by the wrongful act or neglect of one or more Defendants, including their respective officers, agents, or employees.

SCHECTER, SHAFFER & HARRIS, LLP
3200 TRAVIS, 3RD FLOOR
HOUSTON, TX 77006
(713) 524-3500

**6.7**     At the time of the underlying occurrence one or more Defendants were careless, negligent, grossly negligent, and reckless in the following respects:

    a.   In failing to provide a safe work environment;

    b.   In failing to take reasonable precautions during the design, manufacturing, testing, and operation phases of the submersible vessel TITAN;

    c.   In failing to enact and enforce safe policies and procedures for the task at hand;

    d.   In failing to take reasonable precautions to ensure the safety of the crew on board;

    e.   In failing to properly train and supervise the crew of the vessel;

    f.   In failing to provide warnings of unsafe conditions to those onboard the vessel;

    g.   In failing to act in a reasonable manner after design flaws and safety issues were identified and repeatedly notified to the company's governors from both within OCEANGATE INC. itself, and external sources;

    h.   In mispresenting the overall hazards associated with operating the submersible vessel TITAN;

    i.   In misrepresenting the submersible vessel TITAN's operational capabilities and safeness;

    j.   In misrepresenting OCEANGATE INC.'s prioritization and attention to safety in both designing, manufacturing, and operating the submersible vessel TITAN:

    k.   In failing to address clear warnings from industry experts, engineers, consultants, component manufacturers, and test pilots who all identified the submersible vessel TITAN was not capable of repeatedly diving to the depth of the *Titanic*;

    l.   Other negligent acts or omissions as proven at time of trial.

**6.8**     The death of Paul-Henri Louis Emile Nargeolet caused injury and damages to the beneficiaries of Paul-Henri Louis Emile Nargeolet in an amount to be proven at trial.

SCHECTER, SHAFFER & HARRIS, LLP
3200 TRAVIS, 3RD FLOOR
HOUSTON, TX 77006
(713) 524-3500

## VII.   SECOND CAUSE OF ACTION FOR NEGLIGENCE AND GROSS NEGLIGENCE UNDER THE JONES ACT

**7.1**   Plaintiff re-avers and re-alleges each and every allegation of fact and law contained herein as if re-pled in their entirety.

**7.2**   Plaintiff brings this cause of action against Defendants, pursuant to the Jones Act, 46 U.S.C. §30104, et seq.

**7.3**   At all times pertinent herein, one or more Defendants owned, operated, and hired the crew of the TITAN.

**7.4**   At all times pertinent herein, Decedent Nargeolet was employed by one or more Defendants in the capacity of a member of the crew of the TITAN.

**7.5**   At all times pertinent herein, Decedent Nargeolet contributed to, and aided, the submersible vessel TITAN in its mission on navigable waters.  Decedent Nargeolet was tasked onboard the submersible vessel TITAN with aiding in navigation near the Titanic wreckage, collecting scientific data, identifying degradation and wreckage changes, and identifying portions of the Titanic for other crew members.

**7.6**   Decedent Nargeolet performed his role on each mission of the TITAN during his employment with OCEANGATE, including the voyage on June 18, 2023.  Decedent Nargeolet spent in excess of 30 percent of his time working on TITAN (or its supporting surface ship in the same fleet).  Defendant Nargeolet could not perform his assigned duties without being on the TITAN, and the TITAN could not complete its mission without Decedent Nargeolet being on board.

**7.7**   On June 18, 2023, while the TITAN was engaged in navigation, the vessel imploded, killing Decedent Nargeolet and all others onboard the vessel.

**7.8**   The implosion of the TITAN, and the resulting death of Decedent Nargeolet, was caused by the negligence of one or more Defendants, including their respective officers, agents, or employees.

SCHECTER, SHAFFER & HARRIS, LLP
3200 TRAVIS, 3RD FLOOR
HOUSTON, TX 77006
(713) 524-3500

**7.9**     The death of Paul-Henri Louis Emile Nargeolet caused injury and damages to the beneficiaries of Paul-Henri Louis Emile Nargeolet.

**7.10**     At all relevant times, it was feasible for Defendants to provide to Decedent Nargeolet, and said Defendants owed to Decedent Nargeolet, duties of care to provide, *inter alia*, a safe place to work.  Plaintiff further contends that on the occasion in question, the Defendants, acting through their officers, agents, servants, and/or employees, were careless and negligent in breach of the duty owed to Decedent Nargeolet as their employee.

**7.11**     At the time of the underlying occurrence one or more Defendants were careless, negligent, grossly negligent, and reckless in the following respects:

      a.   In failing to provide a safe work environment;

      b.   In failing to take reasonable precautions during the design, manufacturing, testing, and operation phases of the submersible vessel TITAN;

      c.   In failing to enact and enforce safe policies and procedures for the task at hand;

      d.   In failing to take reasonable precautions to ensure the safety of the crew on board;

      e.   In failing to properly train and supervise the crew of the vessel;

      f.   In failing to provide warnings of unsafe conditions to those onboard the vessel;

      g.   In failing to act in a reasonable manner after design flaws and safety issues were identified and repeatedly notified to the company's governors from both within OCEANGATE INC. itself, and external sources;

      h.   In mispresenting the overall hazards associated with operating the submersible vessel TITAN;

      i.   In misrepresenting the submersible vessel TITAN's operational capabilities and safeness;

      j.   In misrepresenting OCEANGATE INC.'s prioritization and attention to safety in designing, manufacturing, and operating the submersible vessel TITAN:

SCHECTER, SHAFFER & HARRIS, LLP
3200 TRAVIS, 3RD FLOOR
HOUSTON, TX 77006
(713) 524-3500

1         k.   In failing to address clear warnings from industry experts, engineers, consultants,

2             component manufacturers, and test pilots who all identified the submersible vessel

3             TITAN was not capable of repeatedly diving to the depth of the Titanic;

4         l.   Other negligent acts or omissions as proven at time of trial.

5  **7.12**    On or about June 18, 2023, and as a direct and proximate result of the negligent acts of

6 Defendants, Decedent Nargeolet sustained fatal injuries, which resulted in injury and damages to

7 his surviving beneficiaries.  Said occurrence and injuries occurred as a result of the negligence of

8 Defendants, their agents, servant, and/or employees, acting in the course and scope of their

9 employment or agency.

10      **VIII.**   **THIRD CAUSE OF ACTION FOR VESSEL UNSEAWORTHINESS**

11            **UNDER THE GENERAL MARITIME LAW**

12  **8.1**     Plaintiff re-avers and re-alleges each and every allegation of fact and law contained herein

13 as if re-pled in their entirety.

14  **8.2**     Plaintiff brings this cause of action vessel unseaworthiness against Defendants pursuant

15 to the General Maritime Law of the United States of America.

16  **8.3**     On or about June 18, 2023, the submersible vessel TITAN was owned, operated,

17 controlled, and/or manned by Defendant, OCEANGATE INC and one or more Defendants.

18  **8.4**     The death of Paul-Henri Louis Emile Nargeolet was caused by Defendants' breach of the

19 absolute duty to furnish a seaworthy vessel.

20  **8.5**     At all relevant times, Defendants owed a duty to furnish a vessel that was seaworthy in all

21 respects with reasonably safe equipment and gear.

22  **8.6**     On or about June 18, 2023, dangerous and unseaworthy conditions existed aboard the

23 submersible vessel TITAN.  As a result, Decedent Nargeolet sustained catastrophic injuries and

24 death.

25

26

SCHECTER, SHAFFER & HARRIS, LLP
3200 TRAVIS, 3RD FLOOR
HOUSTON, TX 77006
(713) 524-3500

**8.7**     Defendants failed to take reasonable and necessary steps to ensure the safety of the vessel's crew.  On or about June 18, 2023, the submersible vessel TITAN was unseaworthy in the following particulars:

      a.   The vessel was functionally incapable of performing its intended use in a safe manner;

      b.   The vessel lacked proper safety systems to protect crewmembers;

      c.   The vessel lacked proper dive monitoring equipment onboard to protect crewmembers;

      d.   The vessel was defectively designed in a manner that was unreasonable in accordance with its intended use,

      e.   The vessel was defectively manufactured in a manner that was unreasonable in accordance with its intended use,

      f.   The vessel lacked proper safety equipment for conducting deep water exploration of the Titanic wreckage,

      g.   The vessel was outfitted with unfit components as they were incapable of withstanding operational exposures associated with the intended use of the vessel; and,

      h.   Other unseaworthy conditions as proven at time of trial.

**8.8**     These breaches of duty proximately contributed, in whole or in part, to cause the death of Decedent Nargeolet, which resulted in injury and damages to his beneficiaries, and for which Defendants are liable to the Plaintiff in damages.

## IX.     <u>FOURTH CAUSE OF ACTION FOR PRODUCTS LIABILITY</u>

**9.1**     Plaintiff re-avers and re-alleges each and every allegation of fact and law contained herein as if re-pled in their entirety.

**9.2**     Plaintiff maintains this cause of action against Defendants, jointly and severally, under the General Maritime Law of the United States and/or the Washington Product Liability Act.

SCHECTER, SHAFFER & HARRIS, LLP
3200 TRAVIS, 3RD FLOOR
HOUSTON, TX 77006
(713) 524-3500

**9.3**     To varying degrees, Defendants designed, assembled, built, manufactured, distributed and/or produced the submersible vessel TITAN.   Defendants, as manufacturers, designers, assemblers, builders, or distributors of the submersible vessel TITAN, owed to Decedent Nargeolet duties of care to supply a safe and non-defective submersible vessel to all foreseeable end users, including a duty to exercise reasonable care in product manufacture.

**9.4**     The subject vessel was unreasonably dangerous in the following ways:

        a.   In construction or composition because the carbon fiber hull was not properly tested for integrity;

        b.   In failing to heed countless warnings about the flaws of the vessel's design and manufacturing processes and instead choosing to assemble and manufacture the vessel in its final iteration

        c.   In design and implementation of hull stress acoustic monitoring system;

        d.   In design and implementation of the viewport which was not rated for the intended operational depth of the vessel;

        e.   The failure to implement reasonable testing to components prior to assembly;

        f.   The failure to provide adequate warning of the potentially dangerous characteristic created by the design and manufacturing flaws; and,

        g.   In other manners to be proven at the time of trial.

**9.5**     The subject vessel suffered from a multitude of defects in design, specifically the decision to construct the vessel's hull entirely out of carbon fiber, the design and implementation of an inadequate and ineffective hull stress monitoring system, and the design and utilization of the vessel's viewport with a depth rating less than twenty percent of depth required to reach the *Titanic* wreckage.

**9.6**     These design defects caused the vessel's hull to fail after being exposed to the extreme pressures experienced when diving to the depths of the wreckage of the *Titanic*. This resulted in

SCHECTER, SHAFFER & HARRIS, LLP
3200 TRAVIS, 3RD FLOOR
HOUSTON, TX 77006
(713) 524-3500

the vessel's implosion on June 18, 2023, which is the legal, direct, and proximate cause of the death of Decedent Nargeolet.

**9.7**     The vessel was in an unreasonably dangerous condition, as a result of the carbon fiber hull, hull acoustic monitoring system, and/or the vessel's viewport, when it left the control of one or more of the Defendants.

**9.8**     The subject vessel suffered from a defect in manufacturing, specifically the lamination and curing of the carbon fiber hull.  This caused the hull to fail after being exposed to the extreme pressures faced by the vessel as it dove to wreckage of the Titanic.

**9.9**     The death of Decedent Nargeolet on June 18, 2023 was without fault on his part, and was caused by a defect in the design, composition, or manufacture of the submersible vessel TITAN, and these conditions existed at the time the vessel left its manufacturer's control and/or resulted from a reasonably anticipated alteration or modification of the vessel.

**9.10**    The condition of the submersible vessel TITAN (i.e., the hull's carbon fiber design, hull monitoring system, viewport, and the lamination and curing of the vessel's carbon fiber hull) made the vessel unreasonably dangerous to normal use.

**9.11**    By reason of the foregoing and as a legal result thereof, Decedent Nargeolet suffered catastrophic injuries that resulted in his untimely death.  These injuries and his death occurred as a result of the negligence of one or more Defendants, their agents, servants, and/or employees, acting in course and scope of their employment or agency.

## X.     <u>FIFTH CAUSE OF ACTION FOR WRONGFUL DEATH UNDER WASHINGTON STATE LAW</u>

**10.1**    Plaintiff re-avers and re-alleges each and every allegation of fact and law contained herein as if re-pled in their entirety.

**10.2**    Plaintiff brings this claim for wrongful death against Defendants, jointly and severally, under Washington Revised Code RCW § 4.20.020.

SCHECTER, SHAFFER & HARRIS, LLP
3200 TRAVIS, 3RD FLOOR
HOUSTON, TX 77006
(713) 524-3500

**10.3**    At all relevant times, Defendants owed a duty to exercise ordinary care to prevent foreseeable injury.

**10.4**    As a result of the wrongful acts and negligence of one or more Defendants, Decedent Nargeolet suffered catastrophic injury and death due to the vessel's implosion on or about June 18, 2023. The death of Decedent Nargeolet caused injury and damages to his surviving beneficiaries.

**10.5**    The breaches of duty alleged herein on the part of one or more Defendants proximately contributed, in whole or in part, to cause the loss of life of Decedent Nargeolet, for which Defendants are jointly and severally liable to Plaintiff in damages.

**10.6**    Some or all of the wrongful acts and negligence of said Defendants, as plead herein, including the failure to take corrective action after numerous design and manufacturing flaws were identified, the failure to protect those onboard the vessel, the misrepresentation of the vessel's operational capabilities and safeness, and the lack of attention to safety in designing, manufacturing, and operating the vessel, constitute gross negligence.

**10.7**    One or more Defendants were aware of the prior issues with the submersible vessel TITAN before June 18, 2023.  Despite prior awareness of the vessel's design and manufacturing flaws, and the well-known risk of serious injury and death that can result from diving to the extreme depths needed to operate at the depth of the Titanic wreckage, Defendants failed to take adequate corrective action to protect or warn others.

**10.8**    Because the wrongful acts and negligence of Defendants, constitutes gross negligence, Plaintiff is entitled to recover both economic and noneconomic damages from said Defendants, pursuant to Washington Revised Code RCW § 4.20.020.

**XI.**    **SIXTH CAUSE OF ACTION FOR PRE-DEATH PAIN AND SUFFERING AND MENTAL ANGUISH**

**11.1**    Plaintiff re-avers and re-alleges each and every allegation of fact and law contained herein as if re-pled in their entirety.

**COMPLAINT** - 24

**11.2**     Plaintiff brings this survival action against Defendants for the pre-death pain and suffering of Decedent Nargeolet under the Jones Act, 46 U.S.C. § 30104 et seq., and/or Washington State Law.

**11.3**     Prior to his violent death, Paul-Henri Louis Emile Nargeolet sustained conscious pre-death pain and suffering as a result of the negligence of one or more Defendants.

## XII.   DAMAGES

**12.1**     Plaintiff re-avers and re-alleges each and every allegation of fact and law contained herein as if re-pled in their entirety.

**12.2**     The death of Paul-Henri Louis Emile Nargeolet was a direct and proximate result of the occurrence alleged herein.  By reason of the foregoing, Plaintiff, as Administrator CTA of the Estate of Paul-Henri Louis Emile Nargeolet, comes now and sues.

**12.3**     Plaintiff maintains this suit for the benefit of the beneficiaries allowed to recover for the wrongful death of Paul-Henri Louis Emile Nargeolet under the Jones Act, 46 U.S.C. § 30104 et seq., the General Maritime Law of the United States, and Washington state law.

**12.4**     Plaintiff, as Administrator CTA of the Estate of Paul-Henri Louis Emile Nargeolet, would show that the beneficiaries of Paul-Henri Louis Emile Nargeolet have suffered a loss of support, both financial and emotional.  The beneficiaries have suffered enormous mental anguish, loss of financial support, and loss of inheritance.  Plaintiff would also show that Decedent's children have suffered a loss of parental consortium, companionship, love, affection and household services, and in a reasonable probability will suffer a loss of parental consortium, companionship, love, affection, and household services into the future.  Plaintiff would also show that Decedent's widow has suffered a loss of consortium, companionship, love, affection and household services, and in a reasonable probability will suffer a loss of these into the future.

**12.5**     Plaintiff, as Administrator CTA of the Estate of Paul-Henri Louis Emile Nargeolet, makes a claim on behalf of the proper beneficiaries for all damages available under the Jones Act, 46

SCHECTER, SHAFFER & HARRIS, LLP
3200 TRAVIS, 3RD FLOOR
HOUSTON, TX 77006
(713) 524-3500

1   U.S.C. § 30104 et seq., the General Maritime Law of the United States, and Washington state

2   law.

3   **12.6**   Defendants, OCEANGATE INC., THE ESTATE OF R.S. RUSH III, TONY NISSEN,

4   GUILLERMO SOHNLEIN, ELECTROIMPACT INC., JANICKI INDUSTRIES, INC.,

5   HYDROSPACE GROUP, INC., are jointly and severally liable to the Plaintiff, who brings this

6   suit for the benefit of all beneficiaries allowed to recover by law, for the following damages

7   resulting from the death of Paul-Henri Louis Emile Nargeolet:

8        a.   Loss of support, financial and otherwise;

9        b.   Loss of services;

10        c.   Loss of nurture, guidance, care, and instruction for the Decedent's children;

11        d.   Loss of inheritance;

12        e.   Mental pain and anguish;

13        f.   Funeral and/or burial expenses;

14        g.   Non-economic damages for the gross negligence of Defendants as allowed by law;

15        h.   Paul-Henri Louis Emile Nargeolet' s pre-death pain and suffering and fear of

16           impending death;

17        i.   Punitive damages for the gross negligence of one or more Defendants to the extent

18           allowed by law; and,

19        j.   All other damages recoverable by law.

20   **12.7**   All said injuries and damages in an extent, not now precisely known, are in excess of

21   $50,000,000.00.

22   ### XIII.   JURY DEMAND

23   **13.1**   Plaintiff RICHARD ORTOLI, as Administrator CTA of the Estate of Paul-Henri Louis

24   Emile Nargeolet, requests a trial by jury on all issues raised herein.

25

26

**COMPLAINT** - 26

# XIV.   <u>PRAYER</u>

**14.1**     WHEREFORE, RICHARD ORTOLI, as Administrator CTA of the Estate of Paul-Henri Louis Emile Nargeolet, prays for the following relief:

      a.  Actual damages and costs incurred herein;

      b.  Pre-judgment interest at the maximum rate allowed by law;

      c.  Post-judgment interest at the maximum rate allowed by law; and,

      d.  Any further relief to which Plaintiff may be justly entitled.

SCHECTER, SHAFFER & HARRIS, LLP
3200 TRAVIS, 3RD FLOOR
HOUSTON, TX 77006
(713) 524-3500

| | | |
|---|---|---|
| 1 | Dated: August 6, 2024 | SCHECHTER, SHAFFER |
| 2 | | & HARRIS, L.L.P. |
| 3 | | By:    */s/ Matthew D. Shaffer* |
| | | MATTHEW D. SHAFFER |
| 4 | | WSBA No. 57271 |
| 5 | | Licensed in Washington, Texas, California, and Colorado |
| 6 | | LAURA B. DE LA CRUZ |
| | | *Pro Hac Vice Application Pending* |
| 7 | | Licensed in Texas and Louisiana |
| | | 3200 Travis St., 3rd Floor |
| 8 | | Houston, Texas 77006 |
| 9 | | Tel: (713) 524-3500 |
| | | Facsimile: (866) 696-5610 |
| 10 | | Mshaffer@smslegal.com |
| | | Ldelacruz@smslegal.com |
| 11 | | |
| | | -AND- |
| 12 | | |
| 13 | | THE BUZBEE LAW FIRM |
| 14 | | TONY BUZBEE |
| 15 | | *Pro Hac Vice Application Pending* |
| | | Licensed in Texas and New York |
| 16 | | CHRIS LEAVITT |
| | | *Pro Hac Vice Application Pending* |
| 17 | | Licensed in Texas |
| 18 | | DAVID FORTNEY |
| | | *Pro Hac Vice Application Pending* |
| 19 | | Licensed in California and Texas |
| | | JP Morgan Chase Tower |
| 20 | | 600 Travis Street, Suite 7500 |
| | | Houston, Texas 77002 |
| 21 | | Tel: (713)-223-5393 |
| 22 | | Tbuzbee@txattorneys.com |
| | | Cleavitt@txattorneys.com |
| 23 | | Dfortney@txattorneys.com |
| | | www.txattorneys.com |
| 24 | | |
| | | Attorneys for Plaintiff, |
| 25 | | RICHARD ORTOLI, AS |
| | | ADMINISTRATOR OF THE ESTATE OF |
| 26 | | PAUL-HENRI NARGEOLET, |
| | | DECEASED |

SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR THE COUNTY OF KING

RICHARD ORTOLI, as Administrator
CTA of the Estate of Paul-Henri Louis
Emile Nargeolet, Deceased

    Plaintiff,

      vs.

OCEANGATE INC., THE ESTATE OF
R.S. RUSH III, TONY NISSEN,
ELECTROIMPACT INC., JANICKI
INDUSTRIES, INC. and
HYDROSPACE GROUP, INC.

    Defendants.

No.

SUMMONS

TO:   OCEANGATE INC., THE ESTATE OF R.S. RUSH III, TONY NISSEN, ELECTROIMPACT INC., JANICKI INDUSTRIES, INC. and HYDROSPACE GROUP, INC.

A lawsuit has been started against you in the above-entitled court by Plaintiff, **Richard Ortoli**, as Administrator CTA of the Estate of Paul-Henri Louis Emile Nargeolet, Deceased.  Plaintiff's claims are stated in the written Complaint, a copy of which is served upon you with this Summons.

In order to defend against the lawsuit, you must respond to the Complaint by stating your defense in writing, and serve a copy upon the undersigned attorneys for the plaintiff within 20 days

SUMMONS & COMPLAINT - 1
Case No.

SCHECHTER, SHAFFER & HARRIS, LLP
3200 Travis St., 3rd Floor
Houston, Texas 77006
(713) 524-3500

after the service of this Summons, or within 60 days if this Summons was served outside the State of Washington, excluding the day of service, or a default judgment may be entered against you without notice. A default judgment is one where the plaintiff is entitled to what he asks for because you have not responded. If you serve a notice of appearance on the undersigned attorney, you are entitled to notice before a default judgment may be entered.

You may demand that the plaintiff file the lawsuit with the court.  If you do so, the demand must be in writing and must be served upon the plaintiff.  Within 14 days after the service of the demand, the plaintiff must file this lawsuit with the court, or the service on you of this Summons and Complaint will be void.

If you wish to seek the advice of an attorney in this matter, you should do so promptly so that your written response, if any, may be served on time.

This Summons is issued pursuant to Rule 4 of the Superior Court Civil Rules of the State of Washington.

Dated this 6th day of August, 2024.

SCHECHTER SHAFFER & HARRIS, L.L.P.

/S/ *Matthew D. Shaffer*

_____

MATTHEW D. SHAFFER
WSBA No. 57271
Licensed in Washington, Texas, California, and Colorado
LAURA B. DE LA CRUZ
*Pro Hac Vice Application Pending*
Licensed in Texas and Louisiana
3200 Travis St., 3rd Floor
Houston, Texas 77006
Tel: (713) 524-3500
Facsimile: (866) 696-5610
Mshaffer@smslegal.com
Ldelacruz@smslegal.com

-AND-

SUMMONS & COMPLAINT - 2
Case No.

SCHECHTER, SHAFFER & HARRIS, LLP
3200 Travis St., 3rd Floor
Houston, Texas 77006
(713) 524-3500

THE BUZBEE LAW FIRM

TONY BUZBEE
*Pro Hac Vice Application Pending*
Licensed in Texas and New York
CHRIS LEAVITT
*Pro Hac Vice Application Pending*
Licensed in Texas
DAVID FORTNEY
*Pro Hac Vice Application Pending*
Licensed in California and Texas
JP Morgan Chase Tower
600 Travis Street, Suite 7500
Houston, Texas 77002
Tel: (713) 223-5393
www.txattorneys.com
Tbuzbee@txattorneys.com
Cleavitt@txattorneys.com
Dfortney@txattorneys.com


Attorneys for Plaintiff,
RICHARD ORTOLI, AS ADMINISTRATOR CTA
OF THE ESTATE OF PAUL-HENRI
NARGEOLET, DECEASED

SUMMONS & COMPLAINT - 3
Case No.

## <u>CERTIFICATE OF SERVICE</u>

*RICHARD ORTOLI VS. OCEANGATE, INC., ET AL*
No. _____

Original COMPLAINT UNDER THE JONES ACT, 46 U.S.C. §30104 et seq., THE GENERAL
MARITIME LAW, AND WASHINGTON STATE LAW to:

| | |
|---|---|
| King County Superior Court - Seattle<br>516 Third Ave, Rm C-203<br>Seattle, WA 98104 | ☐Mail – U.S. First Class<br>☐Fax<br>☒E-filing<br>☐Delivery |

Copies of COMPLAINT UNDER THE JONES ACT, 46 U.S.C. §30104 et seq., THE GENERAL
MARITIME LAW, AND WASHINGTON STATE LAW to:

| | |
|---|---|
| OCEANGATE INC.<br>C/O Fairchild Record Search LTD.<br>3400 Capitol Blvd. SE STE 101<br>Tumwater, Washington 98501<br>*Registered Agent for<br>OCEANGATE INC.* | ☒Mail – U.S. First Class<br>☐Fax:<br>☐Email:<br><br>☒ Delivery |
| OCEANGATE INC.<br>C/O Fairchild Record Search LTD.<br>3400 Capitol Blvd. SE STE 101<br>Tumwater, Washington 98501<br>*Registered Agent for<br>OCEANGATE INC.* | ☒Mail – U.S. First Class<br>☐Fax:<br>☐Email:<br><br>☒ Delivery |
| TONY NISSEN<br>Wherever he may be found | ☒Mail – U.S. First Class<br>☐Fax:<br>☐Email:<br><br>☒ Delivery |
| ELECTROIMPACT INC.<br>C/O Peter Zieve<br>4413 Chennault Beach Rd.<br>Mukilteo, Washington 98275<br>*Registered Agent for<br>ELECTROIMPACT INC.* | ☒Mail – U.S. First Class<br>☐Fax:<br>☐Email:<br><br>☒ Delivery |
| JANICKI INDUSTRIES, INC.<br>C/O Peter W. Janicki<br>719 Metcalf St.<br>Sedro-Woolley, Washington 98284<br>*Registered Agent for<br>JANICKI INDUSTRIES, INC.* | ☒Mail – U.S. First Class<br>☐Fax:<br>☐Email:<br><br>☒ Delivery |

COMPLAINT FOR PERSONAL INJURIES - 4
Case No.

**Blue Water Legal PLLC**
144 Railroad Avenue Suite 308
Edmonds, Washington 98020
(425) 361-2054

| | |
|---|---|
| HYDROSPACE GROUP INC.<br>C/O William Kohnen<br>717 West 12th Street<br>Claremont, California 91711<br><div align="right">*Registered Agent for*<br>*HYDROSPACE GROUP INC.*</div> | ☒Mail – U.S. First Class<br>☐Fax:<br>☐Email:<br><br>☒ Delivery |
| Richard Ortoli | ☒Mail – U.S. First Class<br>☐Email<br>☐Delivery |

    I certify the parties referenced above were served COMPLAINT UNDER THE JONES ACT, 46 U.S.C. §30104 et seq., THE GENERAL MARITIME LAW, AND WASHINGTON STATE LAW  This pleading was served in the manner indicated above on this 6th day of August, 2024.


            */s/ Laura B. De La Cruz*
            Laura B. De La Cruz


COMPLAINT FOR PERSONAL INJURIES - 5
Case No.

**Blue Water Legal PLLC**
144 Railroad Avenue Suite 308
Edmonds, Washington 98020
(425) 361-2054